UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| VINH HUU PHAM and LAN THI DO,<br><br>　　　　Plaintiffs,<br><br>　v.<br><br>CITY OF SAN JOSE, ET AL.,<br><br>　　　　Defendants. | Case No.: 5:11-CV-01526-EJD<br><br>**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>**[Re: Docket Item No. 38]** |

Presently before the Court is Defendants the City of San Jose ("the City"), Officer Brian Jeffrey, and Officer Mathew Blackerby's (collectively, "Defendants") Motion for Summary Judgment as to Plaintiffs Vinh Huu Pham and Lan Thi Do's wrongful death, assault, and battery claims arising under the Civil Rights Act of 1871 (42 U.S.C. § 1983) and California law stemming from the tragic May 10, 2009 shooting of Plaintiff's adult son, Daniel Son Pham. After fully reviewing the parties' briefing and carefully considering the arguments of counsel, and for the following reasons, the Court GRANTS Defendants' motion.

1

## I. Background

The facts of this case are largely undisputed. On May 10, 2009, Brian Pham and his girlfriend Uyen Lam woke up together around 10:00 a.m at the Pham family residence on 967 Branbury Court in San Jose. Deposition of Brian Pham ("Pham Dep.") at 46-48. The only other person in the house with them at that time was Brian Pham's brother, Daniel Son Pham. Id. That morning, Brian saw Daniel smoking a cigarette outside the house, "just calm, normal like everyday." Id. Brian sat down at his computer, and then, for no apparent reason, Daniel came behind him, tilted Brian's head back, and cut Brian's neck with a knife. Id. at 49-51. Brian yelled to Uyen to stay inside and lock the door. Id. at 52-54. He continued to struggle with Daniel, receiving deep cuts to his hand, and fled out of the front door to a neighbor's house. Id.

At 11:33 a.m., San Jose Police Department Communications received two 911 emergency calls. Declaration of Clifford S. Greenberg ("Greenberg Decl.") Exs. A, B. The first call came from the neighbor whose house Brian had fled to. Greenberg Decl. Ex. A. The neighbor explained that Brian had shown up bloody with multiple wounds; that Daniel was high, had a knife, and was in the Pham house; and that Uyen was locked inside that house. Id. The second call came from Uyen, pleading for help and explaining that she was locked inside a bedroom and that "someone went crazy." Greenberg Decl. Ex. B.

Police Communications dispatched the two closest police units to the scene, accompanied by the following initial dispatch: "It's a 415 weapons, 967 Branbury at Commodore. Originally started as a 415 family – someone out of control – now someone is advising someone has been cut up, and someone is armed with a knife and high on drugs." Greenberg Decl. Ex. C. Defendant Officers Brian Jeffrey and Matthew Blackerby, driving separate police units, received the dispatch and responded. Id. On the way to the scene, further dispatches advised them that "it started as a physical between two males and someone got out of control and grabbed a knife," that it "looks like inside the house we have a hang-up so there might not be any further [sic]," and that "the suspect in this is a Son Pham, Son Pham, a Vietnamese male in his twenties. RP is now whispering, says the suspect is just outside the bedroom. Also show one 5150 at that house—associated to a Daniel Pham—not sure if that's our RP." Id.

2

Case No.: 5:11-CV-01526-EJD
ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

1 The Officers arrived at the scene and two individuals flagged them down. Deposition of Officer Brian Jeffrey ("Jeffrey Dep.") at 27-30, Docket Item No. 50 Ex. 5; Deposition of Officer Matthew Blackerby ("Blackerby Dep.") at 30-31, Docket Item No. 50 Ex. 4. They immediately observed an Asian male on the front lawn of the house, holding his neck, with blood coming through his fingers, holding a pipe in one hand. Jeffrey Dep. at 27-30; Blackerby Dep. at 30-31. They were not sure who this person was and ordered him to drop the pipe, which he did. Jeffrey Dep. at 28-29; Blackerby Dep. at 30-32. The Officers then ascertained that this person was the victim, Brian. Brian pointed to a fenced yard at the side of the house and said "He's in the backyard." He also apparently added: "Don't kill him."

The subject home's yard was fenced in, with barbed wire attached near the top of the fence. The Officers first attempted to see into the fenced yard to locate the suspect. Jeffrey Dep. at 29; Declaration of Brian Jeffrey in Support of Mot. for Summ. J. ("Jeffrey Decl.") Exs. A, C, Docket Item No. 41. They did so by climbing on a rock to get a better view over the fence. Jeffrey Dep. at 32; Blackerby Dep. at 34; Jeffrey Decl. Ex. B (photograph of rock and nearby area). They saw a Vietnamese male, now known to be Daniel, who was bloody, holding a knife in one hand and a cigarette in the other, walk from the back yard into view in the side yard. Jeffrey Dep. at 33-34; Blackerby Dep. at 34-35; Jeffrey Decl. Ex. D (photograph of knife). Officer Jeffrey yelled out numerous times for the suspect to drop the knife, but he did not respond and instead stared at the Officers and paced in the yard. Jeffrey Dep. at 42.

According to Defendants, Officer Blackerby told Officer Jeffrey that he (Officer Blackerby), would move around to the side of the fence, climb up it, and attempt to "Tase" the suspect. Blackerby Dep. at 38-39; Jeffrey Dep. at 43-44. As Officer Blackerby was moving around the fence, Officer Jeffrey continued to order the suspect to drop the knife and get on the ground. Jeffrey Dep. at 45. Officer Blackerby hopped onto the fence and saw the suspect walking towards Officer Jeffrey's location with the knife in his hand. Blackerby Dep. at 60. Officer Blackerby yelled for the suspect to stop, which he did momentarily, and Officer Blackerby fired his Taser at him. Id. The Taser did not make full contact with the suspect. Id.

3
Case No.: 5:11-CV-01526-EJD
ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Officer Jeffrey, meanwhile, was still standing on the rock and looking over the fence, but could not see down the fence line to where Officer Blackerby had moved. Jeffrey Dep. 46, 53-54. Officer Jeffrey did see the Taser probes come from the fence line. Id. 55-56. From Officer Jeffrey's perspective it looked like the Taser wires had struck the suspect, but then he saw the suspect holding one of the wires, glaring in the direction the Taser had been fired, and raising the knife. Id. at 59-61. Having heard the clatter of a person hitting the fence, and having seen the Taser wires, Officer Jeffrey believed that Officer Blackerby had actually entered the yard and that the suspect was about to attack him. Id. 60-61. Thus, Officer Jeffrey climbed the fence and entered the yard. Id. at 62-65.

Officer Blackerby, still outside the yard, heard Officer Jeffrey climbing the fence, and saw him coming over the fence. Blackerby Dep. 60, 67-68. He then saw the suspect charging towards Officer Jeffrey as he maneuvered over the barbed-wire. Id. at 69, 82. At that point, Officer Blackerby withdrew his gun. Id. at 74-77. After Officer Jeffrey negotiated the fence, he turned around and saw the suspect charging towards him. Jeffrey Dep. at 66. He engaged him and ordered him to drop the knife, but the suspect didn't comply. Id. At that point Officer Jeffrey saw Officer Blackerby enter the yard, and knew he could not engage the suspect with his gun because Officer Blackerby was at his backstop. Id. Instead, Officer Jeffrey ran to his left, veering around a wheelbarrow to avoid the suspect's stabbing him, and then back peddled toward Officer Blackerby. Id. at 66-67; Blackerby Dep. at 78. Both Officers then moved backwards (towards the fence) with their guns drawn, and yelled at the suspect to drop his knife. Jeffrey Dep. at 67-68; Blackerby Dep. at 78. The suspect did not comply, and continued to advance on them. Id. Once the suspect was within six to eight feet of them, the Officers fired their weapons simultaneously (14 shots total), until he fell to the ground. Jeffrey Dep. at 68, 70; Blackerby Dep. at 82.

Plaintiffs do not dispute much of this account, with the exception that Officer Blackerby's police report said that Officer Jeffrey indicated that he (Officer Jeffrey) was going to climb the fence and that Officer Blackerby was going to move into a position where he could subdue the suspect with the Taser if necessary. Later, in deposition, Officer Blackerby testified that the two Officers had planned for him to run along the fence to attempt to subdue the suspect, but that

4
Case No.: 5:11-CV-01526-EJD
ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Officer Jeffrey had not said he was going over the fence. Compare Blackerby Dep. with Docket Item No. 50 Ex. 1.

During the confrontation, an additional police officer, Officer Banister, arrived on the scene and witnessed part of the incident. Deposition of Jeffrey Banister ("Banister Dep.") at 29. After hearing multiple gunshots, Officer Banister went to a gate at the rear of the property, broke it open, and entered the yard. Banister Dep. at 59. He saw the suspect on the ground, knife still in hand, and both Officers standing with their guns still pointed at the suspect. Id at 59-60. Officer Banister used a shovel to knock the knife out of the suspect's hand and then performed CPR until the paramedics arrived. Id. The paramedics pronounced the suspect dead at the scene. Id.

Less than two minutes passed between the time the Officers arrived at the scene and the time gunshots were reported. See Docket Item No. 50, Ex. 3 (Chronology from Dispatch). Only 22 seconds had elapsed between the time Officer Jeffrey reported that the suspect was refusing to drop the knife and the time he reported the gunshots. Id.

On March 1, 2011, Plaintiffs, the parents of the Decedent Daniel Son Pham, filed a wrongful death lawsuit against the City of San Jose and Jeffrey and Blackerby in state court. See Docket Item No. 1. The case was removed to this court on March 30, 2011. On April 14, 2011, Plaintiffs filed their First Amended Complaint, raising the following claims: (1) § 1983 for wrongful death on behalf of Decedent based on the Officers' provocation of Decedent, who suffered from mental illness; (2) § 1983 for unreasonable entry and search and seizure on behalf of Plaintiffs based on the Officers' warrantless entry into the yard and shooting and killing Decedent without probable cause or other exigency; (3) battery, based on the acts towards Decedent; and (4) assault, based on the Officers' intention to cause Decedent to suffer apprehension of immediate harmful contact, and (5) a substantially identical second claim for assault. See Docket Item No. 4. Defendants moved for summary judgment. Docket Item No. 38. The court now turns to the substance of that motion.

**II. Legal Standard**

A court shall grant a motion for summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A

5
Case No.: 5:11-CV-01526-EJD
ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

material fact is one that would affect the outcome of the proceedings. <u>Anderson v. Liberty Lobby, Inc.</u>, 447 U.S. 242, 248 (1986). The moving party bears the initial burden of demonstrating the absence of a triable issue of material fact. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).

If the moving party meets this initial burden, the non-moving party must then go beyond the pleadings to designate "specific facts showing that there is a genuine issue for trial." <u>Celotex</u>, 477 U.S. at 324; <u>see also</u> <u>Liberty Lobby</u>, 447 U.S. at 249–50 (noting that the nonmoving party bears the burden of producing more than "a scintilla of evidence" of a triable issue of material fact in its favor). The court must regard as true the non-moving party's evidence, if supported by affidavits or other evidentiary material. <u>Celotex</u>, 477 U.S. at 324. Such evidentiary material must consist of admissible evidence. Fed. R. Civ. P. 56(c); <u>see also</u> <u>Hal Roach Studios, Inc. v. Feiner & Co.</u>, 896 F.2d 1542, 1550 (9th Cir. 1990). Merely suggesting that facts are in controversy, or highlighting conclusory or speculative testimony, is insufficient to defeat summary judgment. <u>See</u> <u>Thornhill Publ'g Co. v. GTE Corp.</u>, 594 F.2d 730, 738 (9th Cir. 1979).

Rather, a genuine issue for trial exists when the non-moving party presents evidence from which a reasonable jury, viewing the evidence in the light most favorable to that party, could resolve the material issue in his or her favor. <u>Liberty Lobby</u>, 477 U.S. at 248-49; <u>Barlow v. Ground</u>, 943 F.2d 1132, 1134-36 (9th Cir. 1991). By contrast, a court must grant summary judgment when a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, on which that party will bear the burden of proof at trial." <u>Celotex</u>, 477 U.S. at 322. Summary judgment is particularly appropriate where it appears that no genuine issue of disputed material fact exists and only questions of law remain unresolved. <u>Asuncion v. Dist. Dir. of INS</u>, 427 F.3d 523, 524 (9th Cir. 1970).

### III. Discussion

#### A. Claims Arising under § 1983 (Counts 1 & 2)

The Civil Rights Act of 1871 provides a private right of action for governmental violations of rights conferred under the U.S. Constitution, including the Fourth Amendment. <u>See</u> 42 U.S.C. § 1983. <u>Graham v. Connor</u>, 490 U.S. 386 (1989), explicitly clarified and streamlined a kaleidoscope of pre-existing standards governing claims involving the excessive use of police force in § 1983

6

Case No.: 5:11-CV-01526-EJD
ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

actions. "[A]ll claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." Id. at 395 (emphasis in original). This standard is objective and asks courts to place themselves in the position of a "reasonable officer on the scene," admonishing courts against imposing "20/20 hindsight" or evaluating actual police motives at the time. Id. at 396 (holding that the objective reasonableness standard asks "whether . . . officers' actions are objectively reasonable . . . without regard to their underlying intent or motivation") (internal quotation marks omitted); Scott v. Harris, 550 U.S. 372, 381-83 (2007).[1] Taking into account the totality of the circumstances, the test for reasonableness examines three factors, of which the second is the weightiest: (1) the severity of the crime involved, (2) whether the suspect poses an immediate threat of harm to others, and (3) whether he is actively resisting or evading arrest. Graham, 490 U.S. at 396.

Warrantless searches and seizures within a home or its curtilage are presumptively unreasonable. United States v. Dunn, 480 U.S. 294, 300 (1987); Payton v. New York, 445 U.S. 573, 586 (1980). A defendant may rebut this presumption by satisfying one of three exceptions: (1) consent, (2) exigency, or (3) emergency. Espinosa v. City & Cnty. of San Francisco, 598 F.3d 528, 533 (9th Cir. 2010). Once the emergency exception is successfully demonstrated, it is of such great weight as to typically satisfy, not just the second prong of the Graham test, but the entirety of the test itself.[2] See, e.g., Georgia v. Rudolph, 547 U.S. 103, 118 (2006) ("[T]he question whether the police might lawfully enter over [spousal] objection in order to provide any protection that might be reasonable is easily answered yes.") (emphasis added).

Here, Defendants entered the Pham residence curtilage without a warrant, triggering the presumption that this entry was unreasonable. See Dunn, 480 U.S. at 300. Plaintiffs contend that this entry was an unconstitutional violation of the Fourth Amendment, which provoked Mr. Pham into attacking.[3] In particular, Plaintiffs rely on Billington v. Smith, 221 F.3d 1183 (9th Cir. 2000)

---

[1] For this reason, the various evidentiary discrepancies that Plaintiffs cite involving the Defendants' testimonial evidence regarding the reason they chose to jump the fence are not material to this discussion.
[2] The second prong of Graham closely tracks the test for an emergency. See infra note 5.
[3] Plaintiffs do not argue that the Officers were unjustified in using lethal force once Pham threatened Officers Blackerby and Jeffrey.

7
Case No.: 5:11-CV-01526-EJD
ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

(discussing "provocation" under the Fourth Amendment), to support the view that the Officers used unreasonable tactics, prompting Mr. Pham's attack. They assert that because the Officers had unreasonably created the situation prompting their deadly use of force, they "couldn't constitutionally shoot [their] way out of it." Id. at 1185. Defendants respond that the entry was reasonable under the Graham factors and fits squarely within the emergency exception.[4] The Court now turns to this argument.

### 1. The Emergency Exception and the Graham factors

The emergency exception originates in police officers' caretaking function and allows them to respond to situations that endanger lives or threaten personal injury. Hopkins v. Bonvicino, 573 F.3d 752, 763 (9th Cir. 2009). Warrantless entry is therefore justified in order to render emergency assistance to an injured occupant or to protect an occupant from imminent injury. Brigham City v. Stuart, 547 U.S. 398, 403 (2006).[5] Again, it is viewed objectively. Id. at 404 (citing Graham, 490 U.S. at 397). "The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency." Mincey v. Arizona, 437 U.S. 385, 392 (1978) (quoting Wayne v. United States, 318 F.2d 205, 212 (D.C. Cir. 1963)) (internal quotation marks omitted). It is well established that that police entry of a home or its curtilage to prevent serious injury is entirely proper. See, e.g., Rudolph, 547 U.S. at 118; United States v. Black, 466 F.3d 1143 (9th Cir. 2006) (police officers justified in warrantless entry based on the possibility that a victim who had earlier called 911 might still be in the house); United States v. Martinez, 406 F.3d 1160 (9th Cir. 2005) (law enforcement officers properly entered home in response to yelling emanating from inside home while victim remained outside); United States v. Brooks, 367 F.3d 1128 (9th Cir. 2004) (no Fourth Amendment violation in entering hotel room without a warrant to check on safety of possible victim).

---

[4] Defendants also argue that the consent and exigency exceptions apply, but have supplied little briefing on this topic. Because the Court can resolve this matter on the question of the emergency exception, it is unnecessary to examine the applicability of the consent and exigency exceptions at the present time.

[5] The test strongly resembles the second prong of the Graham test: the threat of injury to others. Compare Mincey v. Arizona, 437 U.S. at 392 ("The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency.") with Graham, 490 U.S. at 396 ("[W]hether the suspect poses an immediate threat to the safety of the officers or others") (elaborating on the factors to consider in excessive use of force claims under § 1983).

8

Case No.: 5:11-CV-01526-EJD
ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Under the facts of this case, the Court finds Blanford v. Sacramento County, 406 F.3d 1110 (9th Cir. 2005) highly instructive. In Blanford, the county sheriff's office received multiple calls describing a man walking through a residential neighborhood brandishing and sometimes licking a 2½ foot Civil War-era cavalry sword. Blanford, 406 F.3d at 1112. The officers on the scene repeatedly ordered the suspect to drop the sword. Id. at 1112-13. However, much like Mr. Pham, the suspect was unresponsive. Eventually he reached the corner of the street, where he held the sword aloft and roared. Id. at 1113. The officers began to wonder if he was mentally disturbed. The officers followed at a distance of 20 to 25 feet for safety purposes and were increasingly concerned that the suspect posed a serious threat to the community. Despite their concerns that he might be mentally disturbed or on medication, they felt they needed to secure the weapon in the interest of public safety. Id. The suspect then wandered toward a house, at which point, he became aware of the officers. The officers saw him reach the front door, upon which he appeared to knock. Nobody answered the door. The suspect then came back toward the driveway and failed to drop the sword upon being ordered to do so. He went around the house to the side gate. The officers, concerned about the potential risk to people beyond the gate, fired shots in his direction. The suspect was hit at least once, but went through the gate and closed it behind him. The officers burst through the gate and found the suspect trying to open a side door to the garage. They ordered him to drop the sword again, but he failed to comply. Id. at 1113-14. The officers shot again out of fear for the occupants of the house. The suspect then proceeded towards the backyard. Id. at 1114. The officers fired again, hitting him in the back and severing his spine, rendering him a paraplegic.

Ultimately it was discovered that the suspect had just taken anti-psychotics, which he had been prescribed to control his schizophrenia and bipolar disorder, and that he was listening to a Discman at maximum volume while walking down the street, and thus could not hear the officers' commands. Additionally, it came to light that the house the suspect approached and tried to enter was his parents' (with whom he lived) and that the house was empty at the time. Taking all of this evidence into consideration, the Ninth Circuit reasoned that, for purposes of each Fourth Amendment claim, the police actions were justified because the police had a reasonable fear for

potential victims inside the house or its curtilage. Id. at 1118. This fear was judged reasonable because the suspect was (a) armed, and (b) trying to get into the house. Id.

The present case presents even more compelling circumstances than those of Blanford. Here, Officers Blackerby and Jeffrey could have held an objectively reasonable fear for a known—not merely speculative—potential victim inside the house, Uyen Lam. While Mr. Pham was not attempting to enter the house, he had access to it at any time through a door not visible to the Officers. As in Blanford, Mr. Pham was armed. Yet more concerning than Blanford, Mr. Pham had already used his weapon to inflict harm, elevating the Officers' objective concern for the threat Mr. Pham posed to others well above mere speculation. As such, the Court finds both that the emergency exception is satisfied and that the second Graham factor weighs especially in Defendants' favor.

To the extent that the remaining Graham factors require discussion, both weigh in Defendants' favor. The first factor, the severity of the crime involved, is extreme: Mr. Pham had just allegedly sliced his brother's neck with a knife. At the very least this violent act would amount to assault with a deadly weapon, a serious crime. See Cal. Penal Code § 245. The evidence also favors Defendants as to the third factor: whether Mr. Pham was resisting arrest and the nature of the warning given to him. Here, the police had repeatedly told Mr. Pham to put down the knife and had attempted to use a Taser to subdue him. Mr. Pham was aware of this Taser attempt because he picked up the Taser barb. As in Blanford, Mr. Pham failed to respond to reasonable police demands throughout the incident. Under Graham, the Court balances these factors against the nature of the Fourth Amendment intrusion—the Officers' entry into the house's curtilage by jumping the fence. The Court finds that the gravity of the crime involved, the existence of a known potential victim to whom Mr. Pham had access, and Mr. Pham's repeated failure to heed police warnings significantly outweigh the Officers' entry into the house's fenced-in yard. Under Graham, the Officers' actions were therefore objectively reasonable and no Fourth Amendment violation lies. Because there is no Fourth Amendment violation present in the instant action, Plaintiffs' cause of action under § 1983 necessarily falls.

### 2. Plaintiff's Contentions Involving Mr. Pham's 5150 Holds and Obvious Non-Lethal Alternatives

Both of Plaintiffs' remaining contentions—namely that the Officers should have known about Mr. Pham's mental illness and taken it into account, and that Defendants ignored an obvious non-lethal alternative—lack legal foundation. This Circuit has rejected the notion that there is a per se rule requiring mentally disabled persons to be treated differently. Doerle v. Rutherford, 272 F.3d 1272, 1283 (2001) ("We do not adopt a per se rule establishing two different classifications of suspects: mentally disabled persons and serious criminals."); see Bryan v. McPherson, 5590 F.3d 767 (9th Cir. 2009) (where a mentally ill individual is a threat to no one, and is merely creating a disturbance, that person "is in need of a doctor, not a jail cell"). This case, however, is unlike the situations in Doerle and Bryan. Plaintiffs admit that Mr. Pham had committed a serious offense. Pls.' Opp'n to Defs.' Mot. for Summ. J. at 16 ("[T]he actions of decedent involved the infliction of serious physical harm."). Therefore, Mr. Pham was not "an unarmed, emotionally distraught individual who is creating a disturbance or resisting arrest." Deorle, 272 F.3d at 1282-83. The contrary is true: Mr. Pham had recently attacked his brother with a knife—a knife he would not abandon despite police commands. His situation represents precisely the sort that Deorle seemed to allow typical police tactics to resolve: to subdue an "armed and dangerous" person who has "recently committed a serious offense." Id.

The second question, regarding the abandonment of an obvious non-lethal alternative appears to mistake the timeline and the nature of the force used. The force used here, which the Plaintiffs contend created the unconstitutional provocation at the foundation of their case, was the hopping of the fence. Simply put, vaulting a fence is not a lethal use of force.[6] To the extent that other non-lethal alternatives were abandoned, even though Ofcs. Blackerby and Jeffrey may have had "less intrusive alternatives available to them," and perhaps should have used a different tactical plan, police officers need only act "within that range of conduct . . . identif[ied] as reasonable." Billington, 292 F.3d at 1188-89 (quoting Scott v. Henrich, 39 F.3d 912, 915 (9th Cir. 1994)).

---

[6] As such, the cases that Plaintiff cites stating that deadly force was excessive (dog pursuit cases, police vehicular barrier cases, etc.) are inapposite and do not apply to the alleged Fourth Amendment violation of hopping the Phams' fence.

11
Case No.: 5:11-CV-01526-EJD
ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Since the Court has already determined that the Officers' actions here were objectively reasonable, the Court also finds that the Officers were not required to pursue <u>other</u> non-lethal alternatives.

Because no independent Fourth Amendment violation occurred when Officers Blackerby and Jeffery jumped the fence of the Pham family residence, Plaintiffs cannot maintain a § 1983 cause of action. Accordingly, the Court GRANTS Defendants' Motion for Summary Judgment as to Counts 1 and 2.

### B. Claims Arising under California Law (Counts 3, 4 and 5)

As the California Supreme Court recently confirmed in <u>Hayes v. County of San Diego</u>, 57 Cal. 4th 622 (2013), claims involving excessive use of force based on California state law are subject to a standard distinct from that implicated in § 1983 claims. Rather, such claims are governed by a "totality of the circumstances" test. <u>Id.</u> at 631. Accordingly, "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." <u>Id.</u> at 632 (quoting <u>Graham</u>, 490 U.S. at 396). The California Supreme Court elaborated:

> In addition, "[a]s long as an officer's conduct falls within the range of conduct that is reasonable under the circumstances, there is no requirement that he or she choose the 'most reasonable' action or the conduct that is the least likely to cause harm and at the same time the most likely to result in the successful apprehension of a violent suspect, in order to avoid liability for negligence."

<u>Id.</u> (citing <u>Brown v. Ransweiler</u>, 171 Cal. App. 4th 516, 537-38 (2009)). Because <u>Brown</u> applied substantially the same "reasonableness" test as the Ninth Circuit in <u>Billington</u>, the Court's analysis in the preceding sections of what would be "reasonable" conduct under the circumstances presented is dispositive of Plaintiffs' state law claims. Accordingly, the Court GRANTS Defendants' Motion for Summary Judgment as to counts 3, 4 and 5.

### IV. Conclusion

The death of a civilian at the hands of law enforcement is tragic and regrettable. However, the law of this Circuit indicates that the actions at issue here do not implicate the Fourth

12

Case No.: 5:11-CV-01526-EJD
ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Amendment or trigger liability under California state law. For the foregoing reasons, the court GRANTS Defendants' Motion for Summary Judgment.

The clerk shall CLOSE this case upon entry of judgment.

**IT IS SO ORDERED.**

Dated: September 30, 2013

                                                     EDWARD J. DAVILA
                                                   United States District Judge